IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-01921-RPM

MERCURY COMPANIES, INC., a Colorado corporation,

  Plaintiff,

v.

COMERICA BANK, a Texas banking association,

  Defendant.

---

### MEMORANDUM OPINION AND ORDER

---

Plaintiff Mercury Companies, Inc. ("Mercury") is a Colorado corporation currently in bankruptcy. It was once one of the largest real estate title services companies in the country. In 2007, Mercury had a $100 million credit facility with Defendant Comerica Bank, along with five other banks ("the Banks"); Mercury and the Banks entered into an Amended and Restated Credit Agreement ("Credit Agreement") in April 2008. As the designated agent under Mercury's Credit Agreement with the Banks, Comerica was authorized to take any action on the Banks' behalf and was required to protect the Banks' interests.

In July 2008, Comerica deemed Mercury to be in default under the Credit Agreement and, exercising the Banks' remedies, blocked Mercury's bank accounts and demanded that it pay the entire amount owed. In this civil action, Mercury claims that Comerica breached the terms of the Credit Agreement and violated an implied covenant of good faith and fair dealing. [Doc. 1 at 40.] Comerica has moved to dismiss Mercury's Complaint, because: (1)

Mercury lacks standing; (2) the doctrine of judicial estoppel bars Mercury's claims; and (3) Mercury has failed to state a claim upon which relief can be granted.

The Court assumes the truth of the following well-pleaded facts.  Under the Amended and Restated Credit Agreement, Comerica and the Banks provided Mercury with a term loan of $45 Million ("Term Loan A"), and the parties reaffirmed and provided for payment of Mercury's obligations under its guaranty of a defaulted $10 million loan to Alliance ("Term Loan B"), Mercury's major California subsidiary.  In return, Mercury agreed to, *inter alia*:

> (a) provide Comerica audited consolidated financial statements of Mercury and its subsidiaries within one hundred twenty (120) days after the end of each fiscal year;

> (b) maintain a Consolidated Leverage Ratio (as defined in the Credit Agreement) of not more than specified ratios as of specified dates; and

> (c) maintain, as of the end of each month and each quarter, a Consolidated "Earnings Before Interest, Taxes, Depreciation and Amortization" ("EBITDA") of not less than specified amounts.

In addition, Mercury agreed to maintain at least $10 million of "Restricted Cash" in an account over which Comerica had exclusive control and maintain a "Formula Amount" of additional cash collateral.  The "Formula Amount" is defined as an amount "equal to the sum of:  (i) Restricted Cash, plus (ii) 90% of the Tax Refund Amount plus (iii) Unrestricted Cash."  [Doc. 1 ¶ 38(d).]  "Unrestricted Cash" is defined as:

> [Mercury's] or any Guarantor's cash (other than Restricted Cash) and Cash Equivalents on deposit with [Comerica] or any Bank, provided [Comerica] has been granted a first priority security interest in such account(s) and (if at a Bank other than [Comerica]) has received an Account Control Agreement from such Bank.

[*Id.* ¶ 38(d)(ii).]  The Credit Agreement required Mercury to deposit an expected tax refund of approximately $20 million ("Tax Refund") as Unrestricted Cash.  Section 4.11 of the Agreement further provided that:

> Until final payment in full of Term Loan A, if at any time and for any reason the aggregate outstanding principal amount of Term Loan A and the Term Loan B Obligations hereunder shall exceed the Formula Amount, Borrower shall either (i) immediately repay an amount of Term Loan A equal to such excess, or (ii) increase its Restricted Cash or (after attaining Financial Compliance) its Unrestricted Cash, by an amount equal to such excess.

[*Id.* ¶ 38(d).]

"Financial Compliance" is defined as Mercury's satisfaction of various conditions, including that there shall exist no Default or Event of Default.

The Credit Agreement defines "default" as "any event which with the giving of notice or the passage of time, or both, would constitute an Event of Default under this Agreement."  § 1.1 at 6.  "Events of Default" was defined as follows:

> 9.1 <u>Events of Default</u>.  The occurrence of any of the following events shall constitute an Event of Default hereunder:
>
> > (a) non-payment when due of (i) the principal or interest on Term Loan A or the Term Loan B Obligations, or (ii) any Fees or interest payments thereon and continuance thereof for five (5) Business Days.
> >
> > (b) non-payment of any money by Borrower under this Agreement or by any Loan Party under any of the other Loan Documents to which it is a party, other than as set forth in subsection (a) above, within five (5) Business Days after notice from [Comerica] that the same is due and payable;
> >
> > (c) default in the observance or performance of any of the conditions, covenants or agreements of Borrower set forth in Sections 4.11(a), 7.1, 7.2, 7.4(a), 7.5, 7.6, 7.7(a) and (e), 7.9 through 7.11 . . . provided that an Event of Default arising from a breach of Sections 7.1(a) through (c) or 7.2(a) through (d) shall be deemed to have been cured upon delivery of the required item . . .

The Banks' remedies for an Event of Default are as follows:

9.2 <u>Exercise of Remedies</u>. If an Event of Default has occurred and is continuing hereunder: (a) [Comerica] may, and shall, upon being directed to do so by the Majority Banks, declare the entire unpaid principal Indebtedness, including the Notes, immediately due and payable, without presentment, notice or demand, all of which are hereby expressly waived by Borrower; ... and (c) [Comerica] may, and shall, if directed to do so by the Majority Banks or the Banks, as applicable (subject to the terms hereof), exercise any remedy permitted by this Agreement, the other Loan Documents or law.

9.3 <u>Rights Cumulative</u>. No delay or failure of [Comerica] and/or Banks in exercising any right, power or privilege hereunder shall affect such right, power or privilege, nor shall any single or partial exercise thereof preclude any further exercise thereof, or the exercise of any other power, right or privilege. The rights of [Comerica] and Banks under this Agreement are cumulative and not exclusive of any right or remedies which Banks would otherwise have.
. . .
9.6 <u>Waiver of Defaults</u>. No Event of Default shall be waived by the Banks except in a writing signed by an officer of [Comerica] in accordance with Section 13.10 hereof. No single or partial exercise of any right, power or privilege hereunder, nor any delay in the exercise thereof, shall preclude other or further exercise of their rights by [Comerica] or the Banks. No waiver of any Event of Default shall extend to any other or further Event of Default. No forbearance on the part of the [Comerica] or the Banks in enforcing any of their rights shall constitute a waiver of any of their rights. Borrower expressly agrees that this Section may not be waived or modified by the Banks or [Comerica] by course of performance, estoppel or otherwise.

In addition, Section 9.1(f) provided that if Mercury or any of its subsidiaries failed to comply with the terms of certain other indebtedness, such noncompliance constituted an Event of Default.

Mercury acknowledges in its Complaint that it violated multiple sections of the Agreement. It provided the Banks a report on May 15, 2008 showing that it violated the Consolidated Leverage Ratio required under Section 7.10, and that it violated the requirement under Section 7.1(a) to provide audited financial statements. [Doc. 1 ¶ 45(b)(iv, vii).] Twelve days later, Comerica notified Mercury in writing that those violations constituted Defaults and/or Events of Default under the Credit Agreement, and reserved all rights to act on them.

4

Mercury submitted another report on June 16, 2008, this time showing that it violated Section 7.11 by falling nearly $100,000 below the Agreement's stated minimum EBITDA of $800,000. The report also indicated that a Mercury holding company, Remington Holdings, Inc., had violated a term of a land loan given it by Colorado State Bank & Trust, which implicated Section 9.1(f). Also, Mercury still had not delivered its 2007 Audited Financial Statements, in continued violation of Section 7.1(a). [*Id.* ¶ 51(b)(iv, vi, vii).]

Mercury had come into compliance with the Remington land loan, the Consolidated Leverage Ratio, and the minimum EBITDA requirements by June 30, 2008. However, it still had not delivered the required audited financial statements.

Mercury obtained a $20 million tax refund in July 2008 and deposited it as Unrestricted Cash in an account with U.S. Bank, as required by the Credit Agreement.

Up until July 2008, Mercury included approximately $6 million on deposit at U.S. Bank in accounts designated for employee health and welfare benefits ("the H&W Account") as part of its Unrestricted Cash collateral under the Agreement. On July 8, 2008, Comerica questioned that practice for the first time. Whether the H&W Account could be included as Unrestricted Cash had implications for whether Mercury was maintaining an adequate Formula Amount relative to the outstanding principal amounts of Loans A and B, as required by Section 4.11 of the Credit Agreement. Comerica requested that Mercury obtain an Account Control Agreement giving Comerica control over the H&W Account, as well as an opinion letter from legal counsel that the H&W Account could be pledged without running afoul of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.

On July 23, 2008, Mercury wired $4 million from the H&W Account at U.S. Bank to an account at Comerica in which Comerica had a first priority security interest. Mercury

informed Comerica that the $4 million was to be treated as Unrestricted Cash, and that it had received the requested opinion letter concerning ERIA.

That night, Comerica notified Mercury by e-mail that the Banks had blocked Mercury's accounts.  Comerica stated that it had the right to do so because Mercury had not cured its earlier defaults, and because, excluding the H&W Account money from the computation of the Formula Amount, Mercury had insufficient Unrestricted Cash on hand to meet its obligation under Section 4.11 of the Credit Agreement.  Two days later, the Banks sent Mercury a letter:  (1) declaring the entire unpaid balance of Loans A and B due and payable; (2) demanding immediate payment of all interest allegedly owing; (3) notifying Mercury that the $10 million in Restricted Cash would be applied to pay the amounts due on the Loans; and (4) notifying Mercury that the Banks had directed U.S. Bank to transfer all of the Unrestricted Cash remaining in Mercury's U.S. Bank account to Comerica, and that the Unrestricted Cash would also be applied to the Loans.  Mercury refers to Comerica's actions as "the Sweep."

As a threshold matter, Comerica challenges Mercury's standing to bring its claims.  To establish standing, Mercury must show that it retained the claims it seeks to assert.  *See In re Western Integrated Networks, LLC*, 329 B.R. 334 (Bankr. D. Colo. 2005) (citing *In re Mako*, 985 F.2d 1052, 1056 (10th Cir. 1993)).  Claim retention in bankruptcy is governed by 11 U.S.C. § 1123(b)(3), which provides:

(b) Subject to subsection (a) of this section, a plan may--
. . .
   (3) provide for—

      (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

>   (B) the retention and enforcement by the debtor, by the trustee, or by a
>   representative of the estate appointed for such purpose, of any such claim or
>   interest; . . . .

The Tenth Circuit Court of Appeals has interpreted Section 1123(b)(3)(B) to require "clear evidence of reservation" of claims in a bankruptcy plan, *see In re Mako*, 985 F.2d at 1055; as such, the plan's reservation language must be "specific and unequivocal." *Id.* at 1055 n.3 (quoting *In re Mako, Inc.*, 120 B.R. 203, 209 (Bankr. E.D. Okla. 1990)).  The majority of courts that have considered the meaning of "specific and unequivocal" in this context have held that specific identification of defendants or causes of action is not necessary, so long as the bankruptcy plan identifies types or categories of retained causes of action.  *See In re Value Music Concepts*, 329 B.R. 111, 119 n.14, 120 n.15 (Bankr. N.D. Ga. 2005) (collecting cases).

Mercury's Chapter 11 Plan provides:

>   Causes of Action.  Except as otherwise provided in the Plan, as of the Effective Date,
>   pursuant to § 1123(b)(3)(B) of the Bankruptcy Code, any and all Causes of Action
>   accruing to the Debtor, or the Debtor in its capacity as debtor-in-possession, not
>   released or compromised pursuant to this Plan, including, without limitation, actions
>   under §§ 544, 545, 547, 548, 549, 550, 551, and 553 of the Bankruptcy Code, shall
>   remain assets of the Estate, and the Debtor shall have the authority to prosecute such
>   Causes of Action for the benefit of the Estate.

[Doc. 6, Ex. A § 8.03.]  Under the Plan, "Causes of Action" means:

>   without limitation, any and all actions, causes of action, liabilities, obligations, rights,
>   suits, debts, sums of money, damages, judgments, claims and demands whatsoever,
>   whether known or unknown, in law, equity or otherwise.

[*Id.* § 2.01.]  Comerica argues that this language fails to specifically and unequivocally retain the claims Mercury now seeks to assert.  [*See* Doc. 6 at 12-19.]

Mercury makes a few arguments in response.  First, it contends that the Court, in its Order dismissing the earlier, related case (*MER, LLC v. Comerica Bank*, No. 12-cv-02116-

7

RPM), impliedly held that Mercury retained its claims.  [*See* Doc. 12 at 6-7.]  This argument is meritless.  The Court's Order was focused solely on whether MER, LLC had standing to enforce Mercury's claims as an assignee.[1]  The issue of claim retention was not raised or decided, even impliedly.

Second, Mercury argues that the requirement of "specific and unequivocal" claim retention language only applies to bankruptcy avoidance claims, not to the state law claims it advances here.  [*See* Doc. 12 at 9-20.]  Section 1123(b)(3) does not distinguish between state law and bankruptcy avoidance claims; rather, it allows bankruptcy plans to provide for "the settlement or adjustment of <u>any claim or interest</u>," and for "the retention and enforcement by the debtor, . . . , of <u>any such claim or interest</u>."  11 U.S.C. § 1123(b)(3)(A-B) (emphasis added).  In addition, Section 1123(b)(3) is, "at least in part, a notice provision.  Creditors have the right to know of any potential causes of action that might enlarge the estate – and that could be used to increase payment to the creditors."  *Harstad v. First Am. Bank*, 39 F.3d 898, 903 (8th Cir. 1994); *see also In re United Operating, LLC*, 540 F.3d 351, 355 (5th Cir. 2008) ("To facilitate [the] timely, comprehensive resolution of an estate, a debtor must put its creditors on notice of any claim it wishes to pursue after confirmation.")  Because state law and avoidance claims each have the potential to enlarge an estate, the notice principle applies with equal force to both; it would be inconsistent with that principle to hold common law claims to a lower standard of specificity.  Although the Tenth Circuit cases relied upon by Comerica deal with avoidance claims, not state law claims (*see In re Mako*, 985 F.2d at 1055; *In re Western Integrated Networks, LLC*, 329 B.R. at 337), Mercury has not cited a

---

[1] MER, LLC is a separate entity from Mercury whose members are Jerrold Hauptman (the former CEO of Mercury before its bankruptcy) and his wife Sherri Hauptman.

case from this jurisdiction drawing the distinction it asks the Court to draw. Courts in the Fifth Circuit have applied the "specific and unequivocal" standard to state law claims. *See In re Nat'l Benevolent Ass'n of the Christian Church*, 333 Fed. Appx. 822, 827 (5th Cir. 2009) (per curiam) ("[T]he dispositive question is whether the plan specifically and unequivocally reserved the pre-petition malpractice claims."); *In re Blue Water Endeavors, LLC*, No. 08-10466, 2011 Bankr. LEXIS 67 (Bankr. E.D. Tex. Jan. 6, 2011) (generic language "[l]awsuits or other claims against third parties" insufficient to retain common law claims). Accordingly, the text of Section 1123(b)(3), its underlying policy, and relevant case law support the position that, as is the case with avoidance claims, a bankruptcy plan must "specifically and unequivocally" reserve any potential state law claims to retain them post-confirmation.

Mercury maintains that its Schedule B listing, Disclosure Statement, Chapter 11 Plan, and specific discussions at meetings of the Committee of Unsecured Creditors ("the Committee") were cumulatively sufficient to put its creditors on notice of its potential claims against Comerica. Mercury filed its Personal Property Schedule B in September 2008 and listed "potential claims against Comerica Bank and the syndicated lending facility" as an asset. Mercury filed its Disclosure Statement and Chapter 11 Plan nearly two years later. The Statement recited many of the pertinent facts underlying Mercury's Complaint here [*see* Doc. 7, Ex. B § II(B)], and, in its section regarding anticipated litigation, specifically identified pending litigation with Fidelity Insurance Company, potential litigation with AIG, and stated: "Mercury is continuing to evaluate other potential litigation claims it may hold, but has not identified any other litigation targets at this time." [*Id.* § III(D)(4).] Potential claims against Comerica and the lending syndicate were not specifically mentioned in the

Statement.   Mercury's Chapter 11 Plan did not specifically mention the claims, either. Instead, it provided that "any and all Causes of Action accruing to the Debtor," including actions under specific sections of the Bankruptcy Code and "any and all actions . . . in law, equity or otherwise" "shall remain assets of the Estate, and the Debtor shall have the authority to prosecute such Causes of Action for the benefit of the Estate."  [Doc. 6, Ex. A §§ 2.01, 8.03.]

Mercury's Schedule B specifically identified its potential claims against Comerica as a potential asset, which would satisfy even the most stringent Section 1123(b)(3) notice standard.  But then two years passed, and there was not a single mention of the Comerica claims in either the Disclosure Statement or the Plan itself, even though the factual bases of the claims were recited in the Plan, and even though the Plan specifically identified other litigations that were either pending (Fidelity) or contemplated (AIG).  The abrupt switch from a specific mention of the claims in the Schedule B to no mention whatsoever in the Disclosure Statement or Chapter 11 Plan two years later supports an inference that Mercury had abandoned pursuing the claims.   While the Plan specifically reserved causes of action under specific sections of the Bankruptcy Code, it did not specifically retain state law claims or claims for breach of contract.  The Plan's "Cause of Action" definition, which refers to "causes of action . . . in law, equity or otherwise", is the type of blanket reservation that is insufficient to put Mercury's creditors on notice of its potential claims against Comerica.

Mercury also relies on extrinsic evidence of the Creditor Committee's deliberations to support its position.  According to a Declaration submitted by Tom Connolly, Mercury's bankruptcy trustee and CEO, the Creditors Committee omitted the Comerica claims from the Disclosure Statement and Chapter 11 plan after making

a conscious decision not to pursue the claims based on a risk reward analysis—for the simple reason that, since creditors anticipated being paid a sufficient potion [sic] of their claims, it did not seem worth incurring the anticipated expense associated with prosecuting the claims in hopes of recovering the remainder (with the excess going to MER's equity holders).

[Doc. 12 at 21; *see also* Doc. 12, Ex. 2 (Connolly Decl.).]   Connolly and the Committee decided instead that they "should negotiate an agreement with the Hauptmans or a designee of the Hauptmans, who would then investigate and, if they elected, arrange for the prosecution of the claims for their own benefit and [the] benefit of the Estate." [Doc. 1 ¶ 95.] And that is precisely what happened:  the Hauptmans formed MER, LLC and brought claims against Comerica in *MER, LLC v. Comerica Bank*, No. 12-cv-02116-RPM, which was dismissed because Mercury did not show an assignment of the claim to MER, LLC.  The Connolly Declaration and the related lawsuit show that Mercury did not intend to retain and pursue the Comerica claims for the benefit of its creditors; instead, Mercury let the Hauptmans pursue those claims, which may or may not go to Plan participants.

The Court concludes that Mercury failed to retain its claims against Comerica and therefore does not have standing to bring them under 11 U.S.C. § 1123(b)(3).

Assuming Mercury has standing, dismissal would still be warranted because it has failed to state viable claims for breach of contract and of the covenant of good faith and fair dealing.  Michigan law governs the construction and enforcement of the parties' Credit Agreement.  In Michigan, as elsewhere:

An unambiguous contract must be enforced according to its terms. . . .  The judiciary may not rewrite contracts on the basis of discerned "reasonable expectations" of the parties because to do so "is contrary to the bedrock principle of American contract law that parties are free to contract as they see fit, and the courts are to enforce the agreement as written absent some highly unusual circumstance, such as a contract in violation of law or public policy."

*Burkhardt v. Bailey*, 260 Mich. App. 636, 657 (2004) (quoting *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776 (Mich. 2003)).   Here, the relevant provisions of the Credit Agreement—Mercury's obligations, events of default, and the Banks' rights and remedies—are not ambiguous.   Therefore, "the intention of the parties as expressed on the face [of the Credit Agreement] must be followed and extraneous matter will not be considered." *L. & S. Bearing Co. v. Morton Bearing Co.*, 355 Mich. 219, 224 (1959).

Mercury alleges that it was entitled to an "unspecified cure period for defaults other than payment defaults . . . ."  [Doc. 1 ¶ 38(j).]   In justifying its Sweep, Comerica asserted that Mercury had defaulted under Sections 4.11, 7.1, 7.10 and 7.11 of the Credit Agreement. Mercury denies that it defaulted under Section 4.11, but acknowledges its defaults under Sections 7.1, 7.10 and 7.11.   Such defaults are explicitly governed by Section 9.1(c), which does not provide for any cure period.   By contrast, Sections 9.1(a) and (b), which govern payment defaults, provide Mercury a five-day grace period, and Section 9.1(d), dealing with non-payment defaults not otherwise governed by Section 9.1(c), requires a default "and continuance thereof for a period of thirty (30) consecutive days" (emphasis added) to constitute an Event of Default.   The explicit inclusion of grace periods in Sections 9.1(a), (b), and (d), taken together with the lack of any grace period Section 9.1(c), implies that no grace period was intended for the defaults at issue here.   *See Howard L. Dubin, D.O., P.C. v. 4 Ward 4 Properties 1, LLC*, No. 226680, 2002 WL 1832331, at *2 (Mich. App. Aug. 9, 2002) (applying principle *expressio unius est exclusio alterius*—express mention of one thing implies the exclusion of other, similar things—to contract).   Implying a grace period for Mercury's non-payment defaults where none was provided would therefore be inappropriate.

Mercury claims that, because Comerica did not explicitly declare Mercury's defaults as Events of Default, the defaults were not actionable. Section 9.1(c) does not require Comerica to provide a declaration or notice of default. Rather, it states, in pertinent part, that "[t]he occurrence of any of the following events shall constitute an Event of Default hereunder: . . . (c) default in the observance or performance of any of the conditions, covenants or agreements of borrower" under Sections 7.1 and "7.9 through 7.11 . . . ." (emphasis added). By contrast, Section 9.1(b) is triggered only if Comerica provides notice that certain monies are due and payable. The lack of any notice requirement in Section 9.1(c) precludes the Court from reading such a requirement into the Agreement.

Mercury also asserts that its defaults were immaterial. For example, it admits that it violated Section 7.1 of the Credit Agreement by failing to provide Comerica audited financial statements for 2007 [*see* Doc. 1 ¶¶ 45(b)(vii), 51(b)(vii)], then goes on to explain why its failure to do so was insubstantial [*see id.* ¶ 48]. Mercury is essentially saying it would be unreasonable to allow Comerica to exercise such drastic remedies given Mercury's minor defaults. But "a court may not revise or void the unambiguous language of [an] agreement to achieve a result that it views as fairer or more reasonable." *Majestic Golf, LLC v. Lake Walden Country Club, Inc.*, 297 Mich. App. 305, 327-28 (2012) (quoting *Rory v. Continental Ins. Co.*, 473 Mich. 457, 489 (2005)). As described above, Mercury's continuing failure to provide audited financial statements constituted an Event of Default that entitled Comerica to exercise the Banks' remedies under the Agreement, which, under Section 9.2(c), included "[declaring] the entire unpaid principal Indebtedness, including the Notes, immediately due and payable, without presentment, notice or demand, all of which are hereby expressly waived by Borrower; ... and (c) [exercising] any remedy permitted by

this Agreement, the other Loan Documents or law." Although Mercury attempts to minimize the importance of its omission, the inclusion of an express provision requiring Mercury to provide audited financial statements under pain of the loans becoming due and payable demonstrates that, to the Banks, the receipt of such statements was important. Mercury's claims of immateriality are unavailing.

Mercury claims that, even though it defaulted on some of its obligations under the Credit Agreement, it nonetheless substantially performed them. The doctrine of substantial performance "applies only when (1) the breach is not material and (2) the contract does not explicitly require the obligation that was breached." *Peach v. Ultramar Diamond Shamrock*, 229 F. Supp. 2d 759, 771-72 (E.D. Mich. 2002). Here, Mercury's breaches were material, and the obligations breached were explicitly required by the Credit Agreement. Therefore, the substantial performance doctrine does not apply.

Mercury asserts that Comerica waived its right to claim an Event of Default by its silent acquiescence to Mercury's defaults. Section 9.6 of the Credit Agreement expressly provides:

> No Event of Default shall be waived by the Banks except in a writing signed by an officer of [Comerica] in accordance with Section 13.10 hereof. No single or partial exercise of any right, power or privilege hereunder, nor any delay in the exercise thereof, shall preclude other or further exercise of their rights by [Comerica] or the Banks. No waiver of any Event of Default shall extend to any other or further Event of Default. No forbearance on the part of the [Comerica] or the Banks in enforcing any of their rights shall constitute a waiver of any of their rights. Borrower expressly agrees that this Section may not be waived or modified by the Banks or [Comerica] by course of performance, estoppel or otherwise.

According to the plain language of Section 9.6, the only way an Event of Default can be waived under the Agreement is "in a writing signed by an officer of [Comerica] in accordance with Section 13.10 hereof." Mercury does not allege that such a writing was

made for any of the defaults at issue here.  Therefore, its waiver argument fails for lack of factual support.

Mercury maintains that Comerica should be estopped from enforcing the Credit Agreement because of its silence as to some of Mercury's defaults.  An estoppel arises where: (1) a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those facts.  *Conagra, Inc. v. Farmers State Bank*, 602 N.W.2d 390, 405 (Mich. App. 1999).  Here, given the Agreement's express anti-waiver provision in Section 9.6, any reliance by Mercury on Comerica's conduct would not have been justified.  *See Archway Cookies v. Smith Cookie Co.*, No. CV 03-895-HA, 2004 WL 1853053, at *7 (D. Or. Aug. 18, 2004) (applying Michigan law to conclude reliance on party's silence would not have been justified, given anti-waiver provision in parties' agreement).

Assuming the truth of Mercury's factual allegations, Comerica acted within its rights under the Credit Agreement.  Mercury's breach of contract claim fails.

Mercury claims that Comerica violated an implied covenant of good faith and fair dealing by denying Mercury additional notice and time to cure before declaring the entire amount due.  Michigan "does not recognize a separate cause of action for breach of an implied covenant of good faith and fair dealing apart from a claim for breach of the contract itself." *Goodwin v. CitiMortgage, Inc.*, No. 12-CV-760, 2013 WL 4499003, at *7 (W.D. Mich. Aug. 19, 2013).  Thus, "[a]n implied covenant of good faith and fair dealing in the performance of contracts is recognized by Michigan law only where one party to the contract makes its performance a matter of its own discretion."  *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822,

826 (6th Cir. 2003).  When the parties have unmistakably expressed their respective rights, no covenant is implied.  *Id.* at 827 (citing *Clark Bros. Sales Co. v. Dana Corp.*, 77 F. Supp. 2d 837, 852 (E.D. Mich. 1999)).  Here, the Credit Agreement explicitly provides for Mercury's obligations and the Banks' rights and remedies in the event those obligations go unfulfilled.  While Comerica could decide whether or how to enforce its remedies, that is not the same as deferring a decision regarding the parties' respective rights.  Therefore, Mercury has failed to state a claim that Comerica breached the implied covenant of good faith and fair dealing.

Given Mercury's lack of standing and its failure to state a claim upon which relief can be granted, the Court need not address the parties' contentions regarding the doctrine of judicial estoppel.

Upon the foregoing, it is

ORDERED that, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), the Motion to Dismiss Complaint by Defendant Comerica Bank [Doc. 6] is granted.  The Clerk shall enter judgment dismissing this civil action.

Dated:  February 12, 2014.

BY THE COURT:

**s/**Richard P. Matsch

_____

Richard P. Matsch
Senior District Judge